UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HARRY BENION, ZACHARY GOODGALL,
DAMON FRANKLIN, and LESLIE MORGAN,

                    Plaintiffs,

v.                                            Case Number 15-14367
                                              Honorable David M. Lawson
                                              Magistrate Judge Mona K. Majzoub

LECOM, INCORPORATED,
LECOM COMMUNICATIONS, INC.
JOSEPH LENTINE, and JEFFREY GENDRON,

                    Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT LECOM COMMUNICATIONS, GRANTING MOTION FOR SUMMARY JUDGMENT BY DEFENDANT LECOM, INC., DENYING MOTIONS FOR SUMMARY JUDGMENT PLAINTIFFS AND BY DEFENDANTS LECOM COMMUNICATIONS, JOSEPH LENTINE, AND JEFFREY GENDRON AND BY PLAINITFFS, AND DISMISSING AMENDED COMPLAINT AGAINST DEFENDANT LECOM, INC. ONLY

        The plaintiffs allege that they were employed as cable television installers by the defendants, who misclassified them as independent contractors to avoid paying them overtime premium wages required by the Fair Labor Standards Act. Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.* The Court denied the defendants' motion to dismiss the FLSA claim and conditionally certified the case as a collective action. After the complaint was amended to add defendants Joseph Lentine and Jeffrey Gendron, and the parties completed discovery, they filed their respective motions for summary judgment, which are pending before the Court. The plaintiffs move for partial summary judgment of liability as to defendants LeCom, Inc. and LeCom Communications, Inc. They filed a separate motion for partial summary judgment of liability against defendants Joseph Lentine and Jeffrey Gendron. LeCom, Inc., LeCom Communications,

Inc., Lentine, and Gendron each have filed separate motions for summary judgment of dismissal. The record contains undisputed facts establishing that the plaintiffs were employees of LeCom Communications, Inc. within the meaning of the FLSA, but that LeCom, Inc. was not involved in an employment capacity as to any of the cable installers. Therefore, the Court will grant the plaintiffs' motion for partial summary judgment as to LeCom Communications, Inc. only and grant LeCom, Inc.'s motion for summary judgment. Fact questions preclude granting summary judgment on the remaining questions, and therefore the Court will deny the other summary judgment motions.

I.

The facts were summarized in detail in the opinion on the motion to dismiss. *Benion v. Lecom, Inc.*, 2016 WL 2801562, at *1-3 (E.D. Mich. May 13, 2016), *reconsideration denied,* 2016 WL 3254611 (E.D. Mich. June 14, 2016). LeCom Communications hired both employees and contractors to furnish fulfillment services (cable installation and service) to several Michigan cable companies, all of which are now owned by Comcast, Inc. The plaintiffs, who are in the second category, maintain that in order to be hired, LeCom requires individuals to contract with one of five specific subcontractor companies at LeCom's direction. However, the plaintiffs allege that in reality, it is LeCom, and not the subcontracting companies, that is employing, assigning work to, and directing each technician.

The facts in the earlier opinion on the motion to dismiss were of necessity taken from the pleadings. Discovery now has been completed, and the parties have furnished a fulsome factual record. Except where indicated, the facts discussed below either were admitted or are otherwise uncontested.

A.  LeCom Inc. and LeCom Communications, Inc.

The defendants continue to insist that LeCom Inc. and LeCom Communications, Inc. are distinct companies that have nothing in common besides their ownership.  The plaintiffs conflate their references to those companies, referring to both as "LeCom."

It appears undisputed that LeCom, Inc. (LeCom) was founded in 1980, and is owned by Joseph Lentine and his brother Anthony.   LeCom Communications, Inc.   (LeCom Communications) was founded in 2001 and also is owned by Joseph and Anthony Lentine.  LeCom Communications was founded to provide fulfillment services (cable installation and service) to a number of Michigan cable companies, all of which are now owned by Comcast, Inc.  LeCom and LeCom Communications each maintain separate headquarters at an office building in Warren, Michigan, along with several other companies — some but not all of which are also owned by Anthony and Joseph Lentine.  According to Lentine, LeCom and LeCom Communications have never shared a bank account, and maintain separate clientele, employees, insurance policies, vehicle fleets, day-to-day leadership, and operations.  LeCom is a utility construction corporation that erects and services high-power utility poles in multiple states on contract with power and light companies, whereas LeCom Communications is a corporation that exists solely to provide cable fulfilment services to Comcast in Michigan.

Since its founding in 2001, all of LeCom Communications's day to day operations have been managed by defendant Jeff Gendron who, although he ultimately reported to Joseph Lentine, was given broad latitude to run the company.  Although LeCom Communications once installed and serviced cable for a number of smaller cable companies, all of those companies have since been acquired by Comcast.  Since 2007 or 2008, Comcast has been LeCom Communications's

sole customer. Comcast contracts a number of fulfillment companies like LeCom Communications to provide cable installation and repair services in the Detroit area and all over the country.

### 1. Joseph Lentine

The Lentine brothers currently are the sole owners of LeCom Communications and LeCom, Inc. Joseph Lentine also is the president of both corporations. He has executed the Comcast contracts on behalf of LeCom Communications since 2007, although he points out that the contracts were "non-negotiable." The Comcast contracts contained most of the obligations and restrictions LeCom Communications imposed on technicians, discussed below. In addition to executing the Comcast contracts, Lentine helped draft the subcontractor agreements, which complied with Comcast's Installation Specification manual. The subcontractor agreements gave LeCom Communications the right to fire technicians at any time, for any or no reason. Lentine testified that he has no background in the cable fulfillment business.

Lentine determined Gendron's pay, regularly reviewed monthly financial statements, and approved the salaries for managers who worked under Gendron based on Gendron's recommendations. Joseph and his brother had check-signing authority and the power to withdraw money from the bank accounts of both companies. Lentine authorized Gendron's decision to hire the plaintiffs and others as "independent contractors." Lentine also approved the installation of GPS devices in company vehicles. Gendron says that he dealt primarily with Lentine when making compensation decisions pertaining to the subcontractors.

The plaintiffs furnished a series of e-mails between defendants Gendron and Lentine that discussed with Comcast bonuses, plans to reduce workforce, rates of pay, and performance

metrics.  In 2017, Lentine decided to terminate the cable installation business with Comcast due to profitability concerns.  The work subsequently was transferred to a company called Amcomm and most of the LeCom technicians were laid off.

According to Lentine, he played no role in LeCom Communications's day-to-day operations.  He testified that Gendron was responsible for screening and retaining the subcontractors and negotiating their agreements, decisions with which Lentine never interfered. Lentine also stated that he never hired, fired, or disciplined any LeCom Communications technicians, had no input in determining their schedules or routes, or provided the technicians with materials and equipment.

### 2.  Jeffrey Gendron

Jeffrey Gendron used to own Elite Communications, Inc. (Elite), which participated in the cable fulfillment business for several service providers.  In 2001, the company was acquired by the Lentine brothers and was renamed LeCom Communications, Inc.  Joseph Lentine testified that Gendron approached him with an offer to purchase Elite.

Because the Lentine brothers did not have experience in cable fulfillment upon purchasing Elite, Gendron stayed on as general manager in charge of operations when the company was renamed.  Gendron reported directly to Joseph Lentine while serving as LeCom Communications general manager from 2001 to November 2017.  According to Lentine, Gendron was responsible for compensation decisions, hiring, retaining, or firing subcontractors, and maintaining employment records including scheduling and number of hours worked by technicians.  Gendron admitted that on at least one occasion, he apparently fired a technician who had recruited help to complete jobs faster without obtaining permission from LeCom.  But Gendron testified in a later

deposition that he never hired or fired any employees of the subcontracting companies.  Gendron also testified that he never defined work hours of employees of the subcontracting companies.

Gendron was never an officer or director of LeCom Communications.  He testified that he never had check writing or banking authority on behalf of LeCom Communications.  He said that that without banking authority, he did not issue checks from LeCom Communications to the subcontractors or the individual plaintiffs.  The plaintiffs admit that they cannot provide evidence of Gendron's check writing.

### B.  Classifications

The defendants argue that none of the plaintiffs were their "employees," that is, true W-2 employees of LeCom Communications or of DCD/EPIQ (a subcontracting house that treated technicians as W-2 employees).  Instead, the defendants contend that they are independent contractors, that is 1099 independent contractors contracting directly for LeCom Communications or subcontractors working for LeCom Communications through a contracting house (a smaller company that ostensibly served as a middleman between LeCom Communications and employees or subcontractor technicians).

Until 2013, nearly all of LeCom Communications's cable installers were classified as employees.  LeCom Communications also contracted with Detroit Communications Direct, who provided a small number of employee technicians.  In 2013, LeCom Communications began to make use of 1099 independent contractors and subcontractor technicians.  By 2015, the most recent year for which LeCom Communications provided complete data, roughly 40% (194 of 502) of LeCom Communications's technician workforce were independent contractors, subcontractors, or employees of contracting houses.  LeCom Communications worked mostly with the following

contracting houses: Great Link Communication (sometimes referred to as "Great Lakes Communication"), Erotech, The Buccilli Group, Reynolds Quality Installations (RQI), and Detroit Communications Direct (DCD), which at some point changed its name to EPIQ.

The defendants' designations, however, are not dispositive, or even controlling. "'The reason is simple: The FLSA is designed to defeat rather than implement contractual arrangements.'" *Keller v. Miri Microsystems LLC*, 781 F.3d 808 (6th Cir. 2015) (quoting *Imars v. Contractors Mfg. Servs., Inc.*, 165 F.3d 27 (6th Cir. 1998) (table decision); *see also Real v. Driscoll Strawberry Assoc.*, 603 F.2d 748, 755 (9th Cir. 1979) ("Economic realities, not contractual labels, determine employment status for the remedial purposes of the FLSA."). The broad definition of "employee" under the FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992).

As the Court noted in its earlier opinion, the facts alleged in this case mirror those in *Keller*, where the court considered whether satellite installation technicians for a satellite-internet-dish installation company were independent contractors or employees. The court examined the misclassification claims using the "economic realities" test. *Id.* at 807. The court suggested six non-exclusive factors to consider in applying that test:

> 1) the permanency of the relationship between the parties; 2) the degree of skill required for the rendering of the services; 3) the worker's investment in equipment or materials for the task; 4) the worker's opportunity for profit or loss, depending upon his skill; 5) the degree of the alleged employer's right to control the manner in which the work is performed; and 6) whether the service rendered is an integral part of the alleged employer's business.

*Ibid.* (quoting *Donovan v. Brandel*, 736 F.2d 1114, 1117 & n.5 (6th Cir. 1984)) (internal quotation marks omitted). The court also considered whether "the business had 'authority to hire or fire the

plaintiff,' and whether the defendant-company 'maintains the plaintiff's employment records.'" *Ibid.* (quoting *Ellington v. City of E. Cleveland*, 689 F.3d 549, 555 (6th Cir. 2012)).  No one factor is controlling.  Instead, the test under the FLSA "looks to whether the putative employee is economically dependent upon the principal or is instead in business for himself." *Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir. 1992); *Keller*, 781 F.3d at 807.

With those factors in mind, let's look at what the discovery in this case has shown.

### 1.  Hiring Process

Comcast required that all potential LeCom Communications technicians — whether employees, subcontractors, or independent contractors — be screened strictly prior to employment.  As part of Comcast's "New Hire Checklist," LeCom Communications was required to obtain an updated driving record, drug test, photograph, criminal history check, and physical examination for each potential technician.   Comcast furnished the service LeCom Communications used to check applicants' criminal histories.

All new technicians, even if they applied to work for a contracting house, were directed first to LeCom Communications and required to fill out a "LeCom Application for At-Will Employment Form."  Plaintiffs Harry Benion and Raphael Sutton, respectively subcontractors for Buccilli and RQI, both were required to complete this form.  Jeff Gendron testified that the form was used only to collect the pertinent information to complete the potential technician's background check, and that the practice of requiring that all new technicians fill out a LeCom Communications job application ended some time in 2016.  LeCom Communications also required its independent contractor technicians, including those working for subcontractor houses, to sign individual "independent contractor" contracts with LeCom Communications.  This agreement

required technicians to complete all assigned work "to the satisfaction of Le Com Communications and [Comcast]."  Pl's. Mot. Ex. 5, LeCom Communications Subcontractor Agreement at §5 (Pg ID 1274).  The agreement entitled LeCom Communications or the potential technician to terminate the relationship without cause, and included a six-month non-compete clause prohibiting technicians from performing installation work for Comcast in any area in which LeCom Communications operates.

Once technicians were cleared for employment, they were issued a Comcast I.D. badge and a Comcast tech number, which were generated by Comcast.  To identify themselves as authorized Comcast representatives, Comcast required technicians to wear those badges whenever they were working in customers' homes.  Some plaintiffs (Benion and Damon Franklin, both Erotech subcontractors) state they were issued LeCom ID badges and employee numbers.  But the record contains no other references to separate LeCom IDs or employee numbers, and it is likely that Benion and Franklin are describing what the defendants and the other plaintiffs refer to as Comcast ID badges and Comcast tech numbers.

## 2.  Supplies and Tools

Under its contract with Comcast, LeCom Communications was required to maintain a warehouse and office for all of the personnel, materials, and tools used in the installation business. The defendants assert that independent contractors were required to provide their own tools and vehicle.  Technicians were provided with, or in the case of independent contractors and subcontractors, were required to provide, common power and hand tools (drills, screwdrivers, etc), cable cutting and insulation tools, and a power meter specific to the cable installation industry. According to LeCom Communications manager John Byrd IV, LeCom Communications

purchased all requisite tools in bulk and made them available for sale to technicians at a discounted rate, deducting the cost from technicians' paychecks (or instructing a technician's contracting house to do so). The total cost of all required tools was a couple hundred dollars.

LeCom Communications provided its employee technicians with vehicles, although the defendants maintain that independent contractor and subcontractor technicians were required to provide their own vehicles. But at least some subcontractors were provided with vehicles by their subcontracting houses. Plaintiff Allen Cleague, a subcontractor through Reynolds Quality Installation, was provided with an RQI vehicle. About a month after he started work, Cleague was transferred to DCD/EPIQ, where he was reclassified as a W-2 employee and provided with a DCD/EPIQ vehicle. Plaintiff Damon Franklin, an Erotech subcontractor, was provided with an Erotech vehicle.

LeCom Communications distributed installation materials to the plaintiffs and other technicians daily before their morning departure. They reported to LeCom to retrieve pre-made packs consisting of all the equipment the tech would need for that day. The plaintiffs did not use any of their own installation materials.

### 3. Training

LeCom Communications did not require potential employees to have any experience. Jeff Gendron testified that new employees with no cable installation experience were required to complete an intensive one-week classroom course on Comcast's particular system. Then they were assigned to ride along with a more experienced technician for six to eight weeks before they were allowed to complete installations on their own.

-10-

In his deposition, Gendron averred that LeCom Communications did not set specific requirements for subcontractor qualifications, leaving training and hiring up to individual contracting houses.   Although Gendron stated that LeCom Communications expected subcontracting houses to bring on technicians with experience in the cable installation field, the plaintiffs averred that in practice contracting houses did not require any qualifications and provided only limited training.  Plaintiffs Allen Cleague and Damon Franklin, subcontractors for RQI and Erotech respectively, testified that they were hired with no cable installation experience and that their training consisted of nothing more than three weeks shadowing a more experienced technician.

### 4.  Work and Route Assignments

Until November of 2015 LeCom Communications was entirely responsible for assigning jobs to technicians.  Each morning, LeCom Communications technicians would report to LeCom Communications's Trumbull warehouse for route assignments and to pick up the hardware that was to be installed in customers' homes.  Byrd said that technicians were not required to report at a specific time, and arrived typically between 6:30 and 8:30 AM.  But according to the plaintiffs, technicians were required to report by 7:00 AM.

LeCom Communications would provide each technician with a list of jobs in a specific area that comprised their "route" for the day.  Each day, Comcast sent LeCom Communications proposed routes without assignment to a specific technician.   Byrd or other LeCom Communications supervisors would generally reshuffle individual jobs into routes that were, according to LeCom Communications, more efficient, geographically logical, or better suited to LeCom Communications's workforce.  Byrd and other supervisors would then assign the routes

-11-

to technicians based on skill level, geographic familiarity, experience, and other factors.  LeCom Communications had the sole authority to determine which technician was assigned to which route; technicians were unable to choose the geographic area or type of jobs to which they would be assigned — although LeCom Communications supervisors would sometimes honor a technician's request for changes.  After being assigned their routes, technicians would wait in line to pick up the equipment to be installed (cable, fittings, set-top boxes, etc) also from the LeCom Communications warehouse.

According to Byrd, he and other LeCom Communications managers "turned a blind eye" to technicians running errands inside their assigned service area or taking breaks, as long as all jobs were completed within the windows outlined on their route sheet.

In November 2015, Comcast instituted a new routing system called the Dynamic Dispatch System (DDS), which substantially changed the way technicians were assigned work.  The new system eliminated the leeway that LeCom Communications had allowed in route assignments.  After DDS went into effect, Comcast assumed all responsibility for assigning routes and jobs to technicians, and LeCom Communications supervisors were not able to alter the routes in any way.  All LeCom Communications technicians were issued iPhones, which Comcast used to assign jobs and track their completion.

Through their phones, technicians were required to keep Comcast continually updated on their status (en route to a job, at a job in progress, refueling, etc).  If a technician entered an unexpected status or fell behind on his route, Comcast employees would call or email Byrd and other LeCom Communications supervisors, who would then contact the technician's contracting house supervisor or in some cases, contact the technician directly.

According to Byrd, he and other LeCom Communications supervisors quickly recognized that DDS was taking a significant toll on technicians. Unlike the previous system, under which technicians were free to take breaks between jobs as long as the jobs were completed on time, DDS required technicians to work nearly constantly. Technicians were required to keep Comcast constantly abreast of their status, and Comcast's "tech accountability" staff complained to LeCom Communications whenever technicians were not working as efficiently as possible. Byrd acknowledged that, after DDS went into effect, a technician working a twelve-hour day had likely been working or commuting between jobs nearly constantly for all twelve hours. To alleviate some pressure, Byrd and the other LeCom Communications managers decided to transition to a five-day work week, though technicians were still given the option to work six days.

Under both systems, technicians were required to complete all the jobs on their route within the prescribed time frame. The plaintiffs testified that technicians were not allowed to refuse any jobs that LeCom Communications assigned them. RQI subcontractor DeAngelo Sutton says that in one instance, he refused an inconveniently located job and received a text message or email from Jay Gendron, a LeCom Communications manager (and relative of Jeff Gendron), informing Sutton that was being suspended for a day. The listed jobs typically represented ten hours or more of work per day. Technicians were allotted specific amounts of time to complete each job and specific time windows within which each job needed to be done. LeCom Communications dispatchers would sometimes call technicians and require them to perform additional jobs not on their route. The plaintiffs testified that if LeCom Communications dispatchers assigned additional jobs, they were unable to refuse under threat of suspension or termination.

After technicians completed their route, they were to call LeCom Communications's dispatchers (if they were a LeCom Communications employee or independent contractor) or their own supervisor (if they were a subcontractor)  and receive a "clear code," signifying that LeCom Communications had no additional jobs in their area and allowing them to return to the warehouse to drop off unused equipment and go home.

LeCom Communications technicians were required to wear uniforms that identified them as authorized representatives of Comcast and of LeCom Communications.  Technicians also were required to display the Comcast logo on their vehicles.   Subcontractors and independent contractors were required to purchase the uniforms and magnetic vehicle decals from LeCom Communications.

## 5.  Quality Control

As part of their fulfilment agreement, Comcast required LeCom Communications to audit at least 10% of the jobs LeCom Communications technicians completed.  Jeff Gendron testified that to satisfy this 10% requirement, LeCom Communications supervisors physically inspected the work of employees and used Comcast-issued tools to remotely assess a customer's cable connection quality.   LeCom Communications required subcontracting houses to submit documentation demonstrating that they had inspected at least 10% of the work performed by their own subcontractors.  Gendron testified that, to his knowledge, LeCom Communications did not audit the work of independent contractors unless a customer complained that a job had not been completed properly, in which case LeCom Communications dispatched another technician to fix the problem.   The plaintiffs testified that in practice, their work was regularly inspected by LeCom Communications supervisors and not by their own contracting houses.  Plaintiff Benion stated that

he received emails addressing customer complaints and quality control issues directly from LeCom Communications supervisors through a "supervisors@lecominc.com" email address.

Comcast itself would often send representatives to audit randomly selected jobs, regardless of the employment classification of the technician who had performed the work. If Comcast representatives found an installation to be defective or noncompliant with Comcast's guidelines, Comcast would report that defect to LeCom Communications and a technician would be dispatched to correct the error. Sometimes technicians were required to fix their own mistakes, and other times they were dispatched to fix the mistakes of other technicians, regardless of employment classification or subcontracting house affiliation.

### 6. Pay

All technicians were paid on a per-job basis, in accordance with rates established by Comcast. Certain jobs were worth more money than others. Independent contractors and subcontractors received a flat rate per job and were not able to earn overtime pay. Subcontractors typically received a check each week from their respective contracting house. LeCom Communications and DCD/EPIQ W-2 employees were eligible to earn overtime and were paid under a system in which the total value of the jobs an employee completed in a pay period was divided by the total number of hours in that pay period to calculate an hourly rate. This hourly rate was then used as the basis to calculate how much overtime pay, if any, an employee would receive. Employee technicians received time-and-a-half pay for hours worked past 40 per week. According to Byrd, LeCom Communications and DCD/EPIC would pay the difference between an employee technician's earnings and minimum wage if an employee earned less than minimum wage (though Byrd asserts that technicians rarely made that little).

If Comcast found that a job was "out of spec," either through inspection or through remote testing, Comcast would refuse to pay LeCom Communications for the job. In turn, LeCom Communications would determine who was the responsible tech and, unless the tech returned to the customer and fixed the issue, deduct the job from the technician's pay (if they were an employee) or direct the technician's contracting house to deduct the job from the technician's pay (if they were a subcontractor). When Comcast refused to pay LeCom Communications for a job, LeCom Communications had no recourse to appeal Comcast's decision. Similarly, technicians who saw their pay deducted had no way to challenge LeCom Communications's decision. Plaintiff Damon Franklin, an Erotech subcontractor, asserted that LeCom Communications directed Erotech not to pay him for jobs "on many occasions."

### 7.  Time Off

Jeff Gendron testified that independent contractors were able to work anywhere from one to seven days a week. The record overwhelmingly contradicts this assertion. The plaintiffs testified that technicians were required in practice to work six days a week. LeCom Communications Manager John Byrd also testified that all technicians were required to work six-day weeks (before the institution of the Dynamic Dispatch System):

> Q. So are you saying before [Dynamic Dispatch], just to clarify, it was a six-day-a-week job and that's what techs were expected to work —
>
> A. Yes.
>
> Q. — is six days a week? And after [Dynamic Dispatch] they're working so hard that LeCom for techs, whether independent contractors or employees, started to move to a five-day-a-week requirement instead of a six-day-a-week?
>
> A. Yes.

Byrd Dep. at 112 (Pg ID 1232).  According to Jerelle Hannah, owner of DCD/EPIQ, "[r]egardless of the classification . . . all technicians show up for work at the LeCom facility each day, on a schedule controlled by LeCom . . . LeCom set the start time and the number of days per week." Hannah also stated that the work performed by DCD/EPIQ employees was identical to the work performed by independent contractors and subcontractors.

Comcast required LeCom Communications to provide a breakdown of available technician manpower every day.  Purportedly to satisfy this requirement, LeCom Communications required all technicians to submit requests for time off, whether they were employees, subcontractors, or independent contractors.  Regardless of a technician's employment classification, LeCom Communications seems to have had the final say as to whether technicians were granted time off. On several occasions, DeAngelo Sutton, an RQI subcontractor, was asked to submit his requests directly to LeCom Communications in a box at the LeCom Communications warehouse using what he described as a "LeCom form."  At some point, LeCom Communications had supplied subcontractors with forms bearing LeCom Communications's name to deal with discipline, time off, billing, payroll deductions, and other "routine matters."  According to Jeff Gendron, those forms were supposed to be used as a template, and not distributed to technicians or actually used. Gendron testified that, as soon as he learned that contracting houses were using the unaltered forms, he advised all contracting houses "to cease using [LeCom Communications] forms and to create their own forms based upon the Comcast Master Agreement."

Regardless of the forms used, the plaintiffs assert that LeCom Communications regularly denied requests for time off and cite several specific instances in which LeCom Communications denied a subcontractor's request for leave (one of which was ultimately reversed).  In 2015, Leslie

Morgan, then a subcontractor for LeCom Communications contracting house Great Link Communications, requested additional days off per week from Great Link. Morgan's supervisor, Joe Dade, informed him he would have to get permission from LeCom Communications. Morgan submitted a written request for time off, which was initially denied by Jay Gendron, who told Morgan that "it is a six-day work week." After Morgan persisted in his request, LeCom Communications granted him time off. Raphael Sutton, a subcontractor working with RQI, requested time off through LeCom Communications, and his request was denied. The plaintiffs also cite an instance in which Harry Benion was denied time off by The Buccilli Group, the contracting house for which he worked, although they do not provide support for the claim that LeCom Communications was directly involved in this denial.

### 8. Supervision and Meetings

Technicians were grouped into "territory teams" that corresponded to the geographic area in which they worked. Each of these teams was supervised by an LeCom Communications manager and included a mixture of employees, independent contractors, and subcontractors. The LeCom Communications supervisors responsible for the teams held performance meetings at LeCom Communications's warehouse that technicians were required to attend. In addition to these smaller team meetings, LeCom Communications would hold weekly meetings of all technicians in which managers, particularly Jay Gendron, would review all technicians' performance metrics and suggest ways in which they could improve. LeCom Communications also posted all technicians' performance scores, regardless of employment classification, on a large screen at their warehouse. Plaintiff Cleague alleges that LeCom Communications managers "frequently threatened to fire [him] and other technicians at these meetings." Both the small team and all-

technician meetings were mandatory.  Morgan was suspended for failing to attend a weekly meeting.

Every Wednesday, Jeff Gendron held a meeting with territory team leaders and contracting house owners (or their representatives).  At these meetings, Gendron and other LeCom Communications managers would discuss the performance of individual technicians, sometimes recommending termination, suspension, or docking their pay, regardless of employment classification or contracting house affiliation.  As a team leader, DeAngelo Sutton attended these meetings, and testified that Gendron and other LeCom Communications managers regularly made employment decisions regarding subcontractors:

> At a number of these meetings, I heard the Gendrons speak specifically about the performance of specific technicians who were independent contractors for the subcontractors.  Specifically, I remember Mr. Jay Gendron ordering that a contractor by the name of Karon be fired as well as another technician by the name of Jackie Turner. The contractor complied with this request.  On another occasion, Reynolds Quality Installations (who paid me) wanted to let someone go by the name of Ray Willis but LeCom manager Gendron told me that Willis was not to be fired.

D. Sutton Decl. at ¶ 13 (Pg ID 1317).

Some time in 2014 or 2015, LeCom Communications instituted the "MIDAS Program," an incentive program that placed each technician in one of ten teams.  Those teams included employees and subcontractors, with no distinction made between them.  Members of the highest performing team were awarded a bonus at the end of each month.  According to Byrd, who managed one of the teams, there were at least three iterations of the MIDAS Program, one of which involved teams separated by subcontracting house, another which involved mixed employment status teams, and a third that was limited to employee technicians only.  In addition to the regular

-19-

weekly meetings, technicians were also occasionally required to attend meetings related to the MIDAS program.

Harry Benion and DeAngelo Sutton previously had worked as employee technicians for LeCom Communications. Both Benion and Sutton left LeCom Communications for at least a year and returned as subcontractors. Benion testified that, under both classifications, he was supervised by LeCom Communications managers in the same manner. Benion also testified that his schedule and duties were identical under both classifications. Plaintiff Allen Cleague worked as a subcontractor through RQI and later as an employee of DCD/EPIQ. Cleague said that he was supervised by LeCom Communications managers in the same manner and held to the same schedule and work requirements while working for both RQI and DCD/EPIQ despite his change in employment classification.

In April of 2016, LeCom Communications communicated to its various subcontractor houses that as of May 2016, LeCom Communications would no longer work with contracting houses that used subcontractors and would require all contracting house-affiliated technicians to be W-2 employees of their respective houses. Jeff Gendron testified that the decision to switch to W-2 employees only was an internal LeCom Communications idea (not suggested by Comcast) and that LeCom Communications owner Joseph Lentine was not involved in the decision (although he was made aware of it). Gendron did not explain why LeCom Communications decided to make this change.

II.

There are six motions for summary judgment (or partial summary judgment) pending.  In essence, the plaintiffs ask for a determination of liability against all the defendants, and each of the four defendants seek dismissal.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts."  *Id.* at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)).  "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion."  *Ibid.*  (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'"  *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted).  A party opposing a motion for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000).  A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001).  "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000).  An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

The Fair Labor Standards Act (FLSA) requires employers to compensate employees who work more than 40 hours in a week at the premium rate of one and one-half times their base rate of pay. 29 U.S.C. § 207(a)(1). "The provisions of the statute are 'remedial and humanitarian in purpose,' and 'must not be interpreted or applied in a narrow, grudging manner.'" *Monroe v. FTS USA, LLC*, 860 F.3d 389, 396 (6th Cir. 2017) (quoting *Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944)).

Under the statute, a qualifying "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee," and a qualifying "employee" is simply "any individual employed by an employer."  29 U.S.C. § 203(d), (e)(1).  To "employ"

-22-

means "to suffer or permit to work." *Id.* at § 203(g). "These are wide-ranging definitions; indeed, the Supreme Court has stated that "'[a] broader or more comprehensive coverage of employees . . . would be difficult to frame.'" *Acosta v. Cathedral Buffet, Inc.*, 887 F.3d 761, 765 (6th Cir. 2018) (quoting *United States v. Rosenwasser*, 323 U.S. 360, 362 (1945)). "The statutory language 'stretches the meaning of "employee" to cover some parties who might not qualify as such under a strict application of traditional agency law principles.'" *Acosta*, 887 F.3d at 761 (quoting *Mendel v. City of Gibraltar*, 727 F.3d 565, 569 (6th Cir. 2013)).

To determine whether an employer-employee relationship exists, courts are directed to "look to the economic realities of the business relationship in light of all the relevant factors." *Acosta*, 887 F.3d at 765 (citing *Ellington v. City of East Cleveland*, 689 F.3d 549, 555-56 (6th Cir. 2012)). "This 'economic reality' standard, however, is not a precise test susceptible to formulaic application." *Ellington*, 689 F.3d at 555 (citing *Donovan v. Brandel*, 736 F.2d 1114, 1116 (6th Cir. 1984)). "It prescribes a case-by-case approach, whereby the court considers the 'circumstances of the whole business activity[.]" *Ibid.*

### A.  LeCom Inc.

The plaintiffs concede that under the economic realities test, LeCom, Inc. cannot be found to be the plaintiffs' employer under the FLSA. They contend, however, that its interrelations with LcCom Communications, namely common ownership, favor joint employer status. *See Skills Dev. Serv., Inc. v. Donovan*, 728 F.2d 294, 300 (6th Cir. 1984) (stating that "a worker may be jointly employed by two entities, each of which is responsible for complying with the [act]") (citing 29 C.F.R § 791.2(a)); *Keeton v. Time Warner Cable*, No. 09-1085, 2011 WL 2618926 (S.D. Oh. July 1, 2011) ("[E]ither the [*Keller*] 'economic realities' test or the *Int'l Longshoremen* 'joint

employment' test could provide a ground for determining that an entity is an employer under FLSA and responsible for paying overtime wages.").

Although the parties quibble over the precise test that applies, the Sixth Circuit identified four factors in determining whether two companies are joint employers: the interrelation of operations between the companies, common management, centralized control of labor relations, and common ownership. *Int'l Longshoremen's Ass'n, AFL-CIO, Local Union No. 1937 v. Norfolk Southern Co.*, 927 F.2d 900, 902 (6th Cir. 1991) (quoting *Metro. Detroit Bricklayers Dist. Council v. J.E. Hoetger & Co.,* 672 F.2d 580, 584 (6th Cir. 1982)); *but see Sanford v. Main Street Baptist Church Manor, Inc.*, 327 F. App'x 587, 594 (6th Cir. 2009) (suggesting a three-factor test considering (1) an exercise of authority to hire, fire, and discipline; (2) control over pay and insurance; and (3) supervision).

LeCom, Inc. attempts to dissociate itself from LeCom Communications, arguing that none of the pertinent factors are satisfied in this case because LeCom, Inc. operates a separate utility business that never engaged the plaintiffs.  The plaintiffs point to LeCom Communications's and LeCom Inc.'s shared email domain and website to establish the requisite connection between the companies.   They also emphasize that Lentine served as president and co-owner of both companies, and according to Gendron, Lentine was the ultimate decisionmaker as to compensation.   But unless LeCom, Inc. is found to be a "sham" corporation, the common ownership or financial control inquiry is not met merely because Lentine owned both companies. *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 996 (6th Cir. 1997) (quoting *E.E.O.C. v. Wooster Brush Co. Employees Relief Ass'n*, 727 F.2d 566, 572 (6th Cir. 1984)).   There is no evidence that LeCom, Inc. is a sham or otherwise was formed for an improper purpose.

The evidence does not support a finding of joint employer status. Lentine asserts that LeCom, Inc. had no hiring or firing authority over the plaintiffs, input into their schedules, control over their compensation, or involvement in the maintenance of their employment records. The plaintiffs seem to believe that more evidence exists linking LeCom, Inc. to LeCom Communications's operations, but that Lentine intentionally deleted emails that contained information bearing on this issue. However, the Court must consider the evidence before it, and it cannot be said that a jury reasonably could conclude that LeCom, Inc. was a joint employer under the relevant factors.

LeCom, Inc.'s motion for summary judgment will be granted, and the plaintiffs' motion for partial summary judgment will be denied as to that defendant.

## B. LeCom Communications

The parties agree that the plaintiffs performed work for LeCom Communications, but the defendant insists that the plaintiffs' subcontractor agreements establish that they were not "employees." As noted above, however contractual agreements and intentions are not dispositive considerations, and the presence of an additional subcontracting agency separating LeCom Communications and the plaintiffs did not alter *Keller*'s precedential guidance on this issue. The Court believes that applying the undisputed facts to those factors establish that LeCom Communications is liable to the plaintiffs under the FLSA. The parties briefly address whether LeCom Communications qualifies as a "joint employer," but because the economic realities test establishes that point, the Court will not discuss the merits of that alternate theory of liability.

The Court evaluates the factors against the evidence viewed in the light most favorable to the defendant to determine if the plaintiffs are "employees." No one factor is controlling. Instead,

the test under the FLSA "looks to whether the putative employee is economically dependent upon the principal or is instead in business for himself." *Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir. 1992); *Keller*, 781 F.3d at 807.

### 1. The permanency of the relationship between the parties

"Generally, independent contractors have variable or impermanent working relationships with the principal company because they 'often have fixed employment periods and transfer from place to place as particular work is offered to them, whereas "employees" usually work for only one employer and such relationship is continuous and indefinite in duration.'" *Keller*, 781 F.3d at 807 (quoting *Baker v. Flint Eng'g & Constr. Co.*, 137 F.3d 1436, 1442 (10th Cir. 1998)). "If a worker has multiple jobs for different companies, then that weighs in favor of finding that the worker is an independent contractor." *Ibid.* In *Keller*, the court reasoned that a jury could find that the plaintiff was an employee where he never turned down job assignments from the defendant, and he believed that he could be terminated for intransigence. *Id.* at 808. The court also noted that several aspects of the job were outside of his control, such as where the customers lived, when the customers were available, and the amount of time to drive to each customer's house. *Ibid.*

The parties disagree about variability in the plaintiffs' schedules. Defendant Gendron testified LeCom Communications employees were required to work five days a week, but the "independent contractors" enjoyed some degree of flexibility:

> Q:      And the independent contractor technicians, you're saying that they could work one day, two days, three days, four days, five, six, seven days a week?
>
> A:      Whatever they wanted.

Gendron Dep. at 123 (Pg ID 1128). However, the plaintiffs' testimony overwhelmingly indicates that they were in fact required to work six days a week and had no say in the matter. Nor could

-26-

they refuse an assignment without fear of discipline.  *See* Benion Decl. ¶ 7, 12 (1362-1364) ("I was required to work six days per week . . . I never refused a job for fear of being fired or disciplined by LeCom"); Cleague Decl. ¶ 8 (Pg ID 1377) ("LeCom required me to report to work at its warehouse early each morning, six days a week"); Morgan Decl. ¶¶ 6, 9 (Pg ID 1310) ("When I began work, LeCom Communications managers informed me that I would be required to work six days per week . . . Mr. Gendron said that he would not be able to approve the time off because 'it is a six-day work week.'").  And LeCom Communications manager John Byrd testified that prior to shifting to the Dynamic Dispatch System, all technicians were required to work six days a week.

The defendants allege that the four named plaintiffs' work history indicates that they moved from employer to employer on a regular basis while working for LeCom Communications. The defendants make only one citation to the record, arguing that plaintiff Morgan testified that he formed his own company to install Comcast equipment as an independent group.  However, Morgan's testimony indicates that he formed an LLC through which he provided services to Great Link Communications and LeCom Communications.  His deposition does not show that he was able to perform work for other cable installation groups while he was under LeCom Communications's subcontractor agreement, and merely demonstrates that he was paid for his work as an independent company rather than as an individual.  That Morgan formed an LeCom Communications does not directly refute the plaintiffs' evidence that LeCom Communications technicians, whether operating as individuals or through LLCs, had no opportunity to seek work elsewhere.  Further, the defendants allege (without citing the record) that plaintiffs Benion, Goodgall, and Franklin did not file taxes for a number of years, so it is impossible to know whether

they received income from other sources.  However, this absence of evidence does not help the defendants satisfy their burden on summary judgment.

The record also indicates that the plaintiffs had no time or opportunity to pursue work elsewhere.  Although Gendron testified that the plaintiffs could work for other companies if they chose, the plaintiffs were expected to work full days, regularly working between 60 and 90 hours a week.  LeCom Communications argued that the plaintiffs were allowed to and did work for other companies while employed by LeCom Communications, referencing plaintiff Zachary Goodgall's deposition, in which he testified that he began doing cable installation for LeCom Communications as an Erotech subcontractor in 2015.  But Goodgall's testimony does not say anything about whether he concurrently performed cable installation work for other companies.  The defendant also cited plaintiff Harry Benion's deposition, but his testimony does not establish that Benion worked for multiple companies at the same time.  Benion stated that he worked at Erotech until November 2014 at which time he switched to the Buccilli Group which had a contract with LeCom Communications.

The parties disagree about at what time technicians were required to report each morning, but it was no later than 8:30 a.m.  LeCom Communications provided each technician with the list of jobs that comprised their route for the day, and those jobs were to be completed within specific amounts and windows of time.  Although supervisors turned a blind eye to technicians running errands during the day so long as their work was completed, after Comcast's Dynamic Dispatch System went into effect, technicians working twelve-hour days likely had no time for breaks.  They were also not allowed to leave for the day until they received a "clear code" from their supervisor or dispatcher that there were no additional jobs in their area.  Moreover, the plaintiffs were often

denied time off and could be fired at any time. In *Hollis v. Dump Cable, Inc.*, the court found that "this type of exclusivity is indicative of the existence of an employer-employee relationship." No. 13-01077, 2014 WL 12526724, at *5 W.D. Tenn. June 23, 2014).

This factor favors a finding that the technicians were employees of LeCom Communications.

### 2. The degree of skill required for the rendering of the services

"'Skills are not the monopoly of independent contractors.'" *Keller*, 781 F.3d at 809 (quoting *Sec'y of Labor, U.S. Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1537 (7th Cir. 1987)). The inquiry is focused on whether an individual's profits increased because of the "'initiative, judgment[,] or foresight of the typical independent contractor,' or whether his work 'was more like piecework.'" *Ibid.* (quoting *Rutherford*, 331 U.S. at 730). The Sixth Circuit noted that "[i]t is also important to ask how the worker acquired his skill." *Ibid.* (citing *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1318 (11th Cir. 2013)). An independent contractor is more likely to have gained the relevant skill though "formal education, an apprenticeship, or years of experience." *Ibid.* However, "if the worker's training period is short, or the company provides all workers with the skills necessary to perform the job," the worker is more likely an employee. *Ibid.* The Sixth Circuit noted in *Keller* that although a satellite installation technician's skill may make them more efficient, the profession is not one that "rises or falls on the worker's special skill." *Ibid.*

The defendant argues that independent contractors possessed greater skill than employee-technicians at LeCom Communications. Byrd testified that every job was assigned points based on how much time Comcast believed it should take, not the actual time on the job. Comcast used

-29-

a points-based system to measure how much it should be billed in a day.  Without elaboration, it is not clear that this point system necessarily was based on the skill of subcontractor-technicians.

Certainly, cable installation technicians are skilled workers.  *See Herman v. Mid-Atl. Installation Servs., Inc.*, 164 F. Supp. 2d 667, 675 (D. Md. 2000) (finding there is no question that cable installation is a skilled trade).  However, "where, as here, a company hires installers with no prior experience and allows them to learn the necessary skills in just a few weeks of on-the-job training, the skills involved must necessarily be fairly simple."  *Hollis*, 2014 WL 12526724, at *6 (collecting cases).  The parties agree that LeCom Communications did not require employees to have any prior experience.  New employees with no cable installation experience were required to complete a two week in-class course on Comcast's system, followed by six to eight weeks of "ride-alongs" with a more experienced technician.  With respect to subcontractors, LeCom Communications expected subcontracting houses to dispatch experienced installers, but nevertheless left training up to them.  The plaintiffs employed by subcontractors testified that they received only limited training.  Although there is some testimony that technicians were dispatched based in part on skill level, the evidence overwhelmingly indicates that whatever skill the technicians possessed was acquired on the job.  *See Swinney v. AMcomm Telecommunications, Inc*, 30 F. Supp. 3d 629, 636 (E.D. Mich. 2014) ("This providing and accepting of unskilled workers favors the Court viewing Plaintiffs as employees. . . .").

This factor also weighs in favor of finding that the plaintiffs were employees.

### 3.  The worker's investment in equipment or materials for the task

To determine whether a worker's capital investment shows evidence of economic independence, courts "must compare the worker's investment in the equipment to perform his job

with the company's total investment, including office rental space, advertising, software, phone systems, or insurance." *Keller*, 781 F.3d at 810. "Investment in something like welding equipment signals a greater degree of economic independence because it is not a common item that most people use daily." *Ibid.* The Keller court weighed the plaintiff's investments in a vehicle, tools, and parts against the defendant's investment in office space, telephones, and computers to schedule installation appointments. *Id.* at 811. The court discounted the investment in the plaintiff's vehicle, however, because the vehicle may also be used for personal purposes and is therefore an item used in everyday life.

Here, the defendants assert that cable installation requires a unique set of tools. However, LeCom Communications purchased all requisite tools in bulk and sold them to technicians at a discounted rate, deducting the amounts from the technicians' paychecks or instructing the contracting house to do so. Those tools cost the plaintiffs a couple hundred dollars up-front. LeCom Communications employees were provided with tools and transportation, while "independent contractors" and subcontractors were required to provide their own common power and hand tools, cable cutting and insulation tools, and a power meter specific to the cable installation industry. Independent contractor and subcontractor technicians generally took care of their own transportation, but at least some plaintiffs were provided with vehicles from their subcontracting houses. On the other hand, LeCom Communications was responsible for providing all installation materials and equipment and maintained a warehouse for its operations, although no estimate as to those costs is evident in the record.

Because the record does not contain evidence of all the parties relative costs, it is not possible to determine conclusively which side's investment outweighed the other's. It is

nevertheless reasonable to conclude that in procuring the installation equipment and renting the warehouse, the defendants expended considerably more money than the plaintiffs, who spent only a couple hundred dollars up-front acquiring tools. In *Hollis*, the court found this factor to be neutral, 2014 WL 12526724, at *5, and in *Keller*, the court concluded that "the trier of fact should decide how Keller's capital investments compared to Miri's." 781 F.3d 799, 811. However, in *Swinney*, the court found that the defendant's scheme of deducting amounts from plaintiffs' paychecks based on tools and vehicles rented supported a finding in the plaintiffs' favor. 30 F. Supp. 3d at 637.

This factor weighs slightly in favor of the plaintiffs based on the facts before the Court.

4. The worker's opportunity for profit or loss, depending upon his skill

This factor questions whether workers "had an opportunity for greater profits based on [their] management and technical skills." *Keller*, 781 F.3d at 812 (citing *Brandel*, 736 F.2d at 1119). It is undisputed that Comcast sent LeCom Communications proposed routes each day, and LeCom supervisors would then decide the number and type of assignments the plaintiffs were given. Assignments were based not only on skill level, but also geographic familiarity, experience, and other factors. LeCom Communications had sole authority over this process. And once the Dynamic Dispatch System was implemented, Comcast assumed all responsibility for assigning routes and jobs to technicians. And under both schemes, technicians were required to complete their routes within Comcast's prescribed time frame, and they were not allowed to refuse any jobs assigned to them, even those assigned later in the day. The plaintiffs were also limited in their ability to hire assistants because all technicians, including assistants, were subject to LeCom Communications's screening processes.

-32-

Byrd testified that under LeCom Communications's points-based system, a subcontractor could complete an eight-hour day worth of points in three hours, describing it as "the glory of it" so that LeCom Communications could increase its revenue. But speculation collides with the evidence that the plaintiffs' routes, assignments, and reporting duties were strictly regimented and foreordained the hours they must spend on the job.

Furthermore, the plaintiffs had no say in the pay they received. All technicians were paid on a piecework basis, receiving a flat rate per job, in accordance with rates established by Comcast. Some jobs, like installation jobs, paid better than troubleshooting or repair jobs, but LeCom had sole authority in deciding which assignments the plaintiffs received. Contrary to the defendants' unsupported assertions, the pace at which the plaintiffs work did not affect their ability to earn more money. There did exist opportunities to earn bonus pay through the MIDAS Program, in which all technicians, regardless of employment status, participated. However, by its third iteration, MIDAS incentives were made available only to employee technicians, foreclosing the opportunity for extra earnings to independent contractors or subcontractors. Furthermore, it is undisputed that LeCom Communications would deduct the plaintiffs' pay when it found their work to be unsatisfactory or equipment went missing — the familiar "charge back" practice that courts have found weighs in favor of employee status. *See Scantland*, 721 F.3d at 1314 (explaining that uncontestable chargebacks that reflect the actual value of the job instead of the cost of damages are "more consistent with disciplining employees").

This factor also favors the plaintiffs because their skill had no bearing on their ability to increase profits.

-33-

5. The degree of the alleged employer's right to control
the manner in which the work is performed

"'Courts, in evaluating this factor, have considered such details as whether workers may choose how much and when to work, . . . whether they must wear uniforms, and how closely their work is monitored and controlled by the purported employer.'" *Swinney*, 30 F. Supp. 3d at 638 (quoting *Scruggs v. Skylink, Ltd.*, No. CIV.A. 3:10-0789, 2011 WL 6026152, at *3 (S.D.W. Va. Dec. 2, 2011)).

As described above, the plaintiffs had essentially no control over their assignments and schedule. Under both the initial LeCom Communications system and Comcast's DDS, the plaintiffs were expected to work at least six days a week and were assigned routes from which they could not deviate. These facts are undisputed. The plaintiffs' preferences for a particular geographic area or type of job were not considered, although before implementation of DDS, LeCom Communications supervisors would sometimes honor a technician's request for changes. Once their routes were completed, the plaintiffs could not retire for the day until they received a "clear code" from LeCom Communications. LeCom Communications also had final say as to the plaintiffs' requests for time off. For at least part of their time working for LeCom Communications, the plaintiffs were required to submit request-for-leave forms bearing LeCom Communications's name, and even those working for subcontracting houses were at LeCom Communications's mercy.

Furthermore, in accordance with their contractual obligations to Comcast, LeCom Communications required its technicians to wear uniforms that identified them as authorized representatives of Comcast and LeCom Communications. They also had to display the Comcast logo on their vehicles. In *Hollis*, the court found that these same circumstances suggested that the

-34-

plaintiffs were employees. *See Hollis*, 2014 WL 12526724, at *8 ("Installers were required to wear Company uniforms and to advertise the Company's logo on their vehicles."); *but see Keller*, 781 F.3d at 815-16 ("Miri did not require that Keller wear a uniform with Miri's or HughesNet's logo . . . A uniform can often be a sign of control, but the uniforms were not required, nor did they connect Keller to Miri.").

Moreover, LeCom Communications maintained direct supervisory authority over the plaintiffs, including absolute power to terminate technicians and the right to monitor their work. The plaintiffs' subcontracting agreement noted that LeCom Communications could terminate their contract for any reason and included a non-compete clause that limited the plaintiffs' ability to pursue similar work for six months after their relationship ended. LeCom Communications also routinely inspected the plaintiffs' work and would dock their pay if the job was not up to Comcast standards. Additionally, all technicians, regardless of employment status and under threat of discipline, were required to attend performance meetings. Unlike in *Swinney*, where there was a dispute as to whether meetings were mandatory, 30 F. Supp. at 639-40, the defendants do not contest that all technicians were required to attend performance meetings. *See Swinney*, 30 F. Supp. at 640 ("If Defendant compelled the meetings, threatened termination, and backcharged for absences, the Court would be more inclined to find that Plaintiffs and Defendant had an employee-employer relationship.) In addition to technician meetings, Gendron admitted that LeCom Communications supervisors held weekly management meetings where they would frequently make employment decisions based on technician performance, including having final say on whether a subcontracting house could terminate a technician.

Unlike in *Keller*, where Keller made some decisions free from Miri's control, including bringing assistants on some installation jobs and responding to customer needs without first checking in with Miri, 781 F.3d at 814-15, the plaintiffs here had no such autonomy. The record indicates that technicians were required to seek LeCom Communications's permission before enlisting help or amending a work order.

The defendants apparently do not dispute this evidence. Instead, the defendants focus their argument on the several Comcast-imposed requirements and assert that LeCom Communications's control functions are "characteristic of the industry" and should not be factored into the *Keller* analysis. The defendants rely on *Herman v. Mid-Atlantic Installation Services*, 164 F. Supp. 2d 667, 672 (D. Md. 2000), where the court concluded that having to comply with the defendant's and Comcast installation specifications was "entirely consistent with the standard role of a contractor who is hired to perform highly technical duties." That court went on to say that the strict procedures and requirements imposed on installers by way of defendant's contract with Comcast "stem from the nature of the business and the need to provide reliable service and convenience to the consumers, not the nature of the relationship between MAT and Installers." *Id.* at 674.

But this and similar blame-shifting arguments have been rejected by other courts. In *Scantland*, the court disagreed with the defendants' argument that its "quality control measures and regulation of schedules stemmed from the 'nature of the business'":

> The economic reality inquiry requires us to examine the nature and degree of the alleged employer's control, not why the alleged employer exercised such control. Business needs cannot immunize employers from the FLSA's requirements. If the nature of a business requires a company to exert control over workers to the extent that Knight has allegedly done, then that company must hire employees, not independent contractors.

-36-

721 F.3d at 1316; s*ee Swinney*, 30 F. Supp. 3d at 642 (declining to follow *Herman*); *see also Keller*, 799 F.3d at 814 (explaining that requiring technicians to comply with HughesNet specifications did not foreclose a jury from finding that Miri controlled Keller's job performance through its initial training and hiring practices).

At oral argument on the motions, defense counsel insisted that LeCom Communications had no authority to terminate the plaintiffs, citing only Gendron's declaration from April of this year, where he testified that LeCom Communications did not have authority to discipline or fire a technician performing services for a subcontractor.  But his statement plainly is contradicted by LeCom's own subcontractor agreement and DeAngelo Sutton's testimony from June 2017 that he specifically recalled at a supervisor meeting Gendron ordering the termination of two subcontractor-technicians.  Sutton also noted that when his subcontractor group wanted Sutton to fire a subcontractor-technician, Gendron instructed Sutton not to fire him.

Byrd also testified that he was responsible for keeping performance metrics for all technicians, including those classified as independent contractors.  Byrd explained that on a daily basis he sent real-time numbers to the field "so people were aware and conscious, see what tech was failing."  These numbers would be discussed at weekly management meetings.  He noted that this kind of supervision occurred without regard to the technicians' classification because to Comcast, all technicians were considered the same.

 The evidence overwhelmingly establishes that LeCom Communications controlled every aspect of the way the plaintiffs received their assignments and performed their work.  This factor weighs heavily in favor of the plaintiffs.

6.  Whether the service rendered is an integral part of the alleged employer's business

"The more integral the worker's services are to the business, then the more likely it is that the parties have an employer-employee relationship."  *Keller*, 781 F.3d at 815 (quoting *Keeton v. Time Warner Cable, Inc.*, No. 09-1085, 2011 WL 2618926, at *6 (S.D. Ohio July 1, 2011)). Because "the only services [the defendant] provides are satellite-dish installation and repair," *ibid.*, there is no genuine dispute of material fact as to whether the plaintiffs are integral to LeCom Communications's business.  *See also Swinney*, 30 F. Supp. 3d at 647 ("Given the necessity of the technicians to fulfill daily cable installation requirements, the Court finds this factor favors finding an employee status.").  In fact, without the plaintiffs and those similarly situated contractors, LeCom Communications, which exclusively furnishes fulfillment services to cable companies, would have no business.

7.  Additional factors

The Sixth Circuit also considers whether "the business had 'authority to hire or fire the plaintiff,' and whether the defendant-company 'maintains the plaintiff's employment records.'" *Id.* at 807 (quoting *Ellington*, 689 F.3d at 555).  Under the parties' subcontractor agreement, LeCom Communications had the power to terminate the plaintiffs at any time, with or without cause.  The plaintiffs also expressed that they operated under the threat of termination if they refused assignments or their performance was deemed unsatisfactory, and that fact appears to be undisputed.  Moreover, because LeCom Communications supervisors regularly reviewed the plaintiffs' performance metrics and filed disciplinary paperwork and requests for time off, it can be said reasonably that it maintained at least some of the plaintiffs' employment records.

* * * * * * * *

-38-

Applying the relevant factors to the undisputed facts, it is clear that the plaintiffs were employees of LeCom Communications. No reasonable jury could conclude otherwise. The plaintiffs' motion for partial summary judgment of liability against LeCom Communications will be granted.

## C. Individual Liability

Lentine and Gendron both argue that they were not the plaintiffs' "employers" within the meaning of the FLSA. They each heavily rely on *Dole v. Elliott Travel & Tours, Incorporated*, 942 F.2d 962 (6th Cir. 1991), to divorce themselves from the plaintiffs' claims. The plaintiffs argue that their evidence overwhelmingly supports a contrary finding, or at least presents a question of fact reserved for a jury. The evidence in the record could support both arguments, but it is not conclusive either way. Neither side is entitled to a judgment as a matter of law.

Acknowledging that "[t]he FLSA contemplates there being several simultaneous employers who may be responsible for compliance with the FLSA," *id.* at 965 (citing *Falk v. Brennan*, 414 U.S. 190, 195 (1973)), the *Dole* court declared that "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages.'" *id.* at 965 (citing *Donovan v. Agnew*, 712 F.2d 1509, 1511 (1st Cir. 1983)). In adopting the multi-factor test announced in *Agnew*, the court explained that "'corporate officers with a significant ownership interest who ha[ve] operational control of significant aspects of the corporation's day to day functions, including compensation of employees, and who personally made decisions to continue operations despite financial adversity during the period of non-payment' [qualify as] employers under the FLSA." *Id.* (quoting *Agnew*, 712 F.2d at 1512)). The

court cautioned that "[n]o one factor is dispositive." *Id.* at 965 (quoting *Donovan v. Sabine Irrigation Co., Inc.*, 695 F.2d 190, 195 (5th Cir. 1983)). Moreover, "[t]o be classified as an employer, it is not required that a party have exclusive control of a corporation's day-to-day functions," *id.* at 966, and delegation of duties to lower level managers does not preclude a finding of "employer" status. *Ibid.*

In *Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013), the Second Circuit — surveying opinions across the courts of appeals — provided further guidance on the issue of "operational control." The court began by noting that "[m]ost circuits to confront this issue have acknowledged — and plaintiffs do not dispute — that a company owner, president, or stockholder must have at least some degree of involvement in the way the company interacts with employees to be a FLSA employer.'" *Id.* at 107 (collecting cases). The court concluded,

> [e]vidence that an individual is an owner or officer of a company, or otherwise makes corporate decisions that have nothing to do with an employee's function, is insufficient to demonstrate "employer" status. Instead, to be an "employer," an individual defendant must possess control over a company's actual "operations" in a manner that relates to a plaintiff's employment. It is appropriate, as we implicitly recognized in [*Herman v.*] *RSR* [*Sec. Servs. Ltd.*, 172 F.3d 132 (2d Cir. 1999)], to require some degree of individual involvement in a company in a manner that affects employment-related factors such as workplace conditions and operations, personnel, or compensation—even if this appears to establish a higher threshold for individual liability than for corporate "employer" status.

*Id.* at 109. The court nevertheless cautioned that "this does not mean that the individual 'employer' must be responsible for managing plaintiff employees — or, indeed, that he or she must have directly come into contact with the plaintiffs, their workplaces, or their schedules — the relationship between the individual's operational function and the plaintiffs' employment must be closer in degree than simple but — for causation." *Id.* at 110.

-40-

1. Jeffrey Gendron

Gendron argues that the *Dole* factors favor him as he had no an ownership interest in LeCom Communications or LeCom, Inc., did not hold an officer position, and lacked control of LeCom Communications's day-to-day operations. Gendron testified that he lacked check-writing, banking, and hiring and firing authority. He also stated that he played no role in the plaintiffs' compensation, noting that the plaintiffs received their payments and 1099s from the subcontractor groups. As additional evidence of his lack of operational control, Gendron argues that the plaintiffs themselves did not consider him to be their employer as they never notified him when they ceased employment with their subcontractors. He also notes that during their employment, the plaintiffs never wore any badge or uniform that displayed his name, nor did they drive any vehicles personally owed by him.

The plaintiffs' version of the facts casts significant doubt on Gendron's assertions. The plaintiffs point to Gendron's deposition testimony and other LeCom Communications documents that unquestionably implicate Gendron as the "top man" at that he played no role in the plaintiffs' compensation. For example, Gendron held weekly meetings with the LeCom Communications managers to discuss the performance of individual technicians, sometimes recommending termination, suspension, or docking their pay, regardless of employment classification or contracting house affiliation. Perhaps more damaging, Lentine testified that Gendron essentially was solely responsible for LeCom Communications operations, including hiring and firing, compensation, and all dealings with subcontractor groups.

Moreover, Gendron's attempt to distinguish himself from the individual defendant in *Donovan v. Sabine Irrigation Co., Inc.*, 695 F.2d 190 (5th Cir. 1983), is not persuasive in light of

the plaintiffs' version of the facts.  In that case, the Fifth Circuit affirmed the district court's finding of employer status where the defendant, among other things, "exercised pervasive control over the business and financial affairs of Sabine Irrigation," and "maintained continuous contact with his Tulsa office and indirect control[] [over] many matters traditionally handled by an employer in relation to employee (such as payroll, insurance, and income tax matters)."  *Id.* at 195.  In fact, *Donovan* undermines Gendron's position; the court went on to say that the trial court properly "discounted [the defendant's] self-serving disavowals of involvement in Sabine's operations." *Ibid.*  Viewing the facts in a light most favorable to the plaintiff, this Court must do the same.  On the other hand, the plaintiffs have not established that no reasonable juror could find for Gendron as the extent of his involvement remains unclear.

The plaintiffs aptly cite *Reich v. Circle C. Investments, Incorporated*, 998 F.2d 324 (5th Cir. 1993).  There, not only did the defendant lack an ownership interest in the entity employer, but he also lacked control of the day-to-day operations.  *Id.* at 329.  Despite all that, the court found that he exercised sufficient "control over the work situation" to qualify as an employer.  *Ibid.* Notably, the defendant was "the driving force behind the nightclub."  *Ibid.*  "[H]e hired two of the dancers who testified at trial; several of the witnesses identified him as their supervisor and testified that he gave specific instructions to employees; . . . he removed money from Circle C's safes; [and] he signed employees' payroll checks."  *Ibid.*  Likewise, Gendron's lack of ownership interest is not outcome determinative where he evidently played a non-negligible role in LeCom Communications's operations.

The parties' conflicting accounts preclude summary judgment for either side.

## 2. Joseph Lentine

Lentine similarly disavows his involvement in LeCom Communications's day-to-day operations since 2001, insisting that Gendron was the one in charge. In his affidavit, Lentine explained that Gendron exclusively was responsible for determining all compensation at LeCom Communications, and that Lentine has never overridden any of Gendron's compensation-related decisions. Lentine stated that Gendron similarly was in charge of all subcontracting decisions, including division of labor and compensation for the groups' services. He further noted that he does not have any role in the hiring, disciplining, or firing of any LCC employees or technicians, nor does he have any say in their schedules. Lentine also makes a variety of other assertions that dissociate him from LeCom Communications, curiously citing unanswered requests for admissions propounded on the plaintiffs.

Although not as strong as in Gendron's case, the plaintiffs have put forth sufficient facts that undercut Lentine's "self-serving disavowals of involvement." The plaintiffs initially note that they timely responded to Lentine's requests for admissions, denying many of the requests he cites in his favor. Also, Lentine admitted that he and Gendron have held weekly meetings since 2001 to discuss LeCom Communications's finances and other issues stemming from the company's relationship with Comcast, and that he executed all contracts with Comcast since 2007. There is evidence that in addition to his status as president and owner of LeCom Communications, Lentine signed payroll checks for LeCom Communications employees and approved the decision to hire the plaintiffs as "independent contractors" in the first place. The plaintiffs assert that while Gendron possessed hiring and firing authority, Lentine could have exercised such control if he chose to do so. Lentine also made the decision to terminate LCC's business with Comcast in 2017.

The record contains a series of emails that indicate Lentine was more involved in LeCom Communications's operations than he lets on. In emails from August 2015 and February 2016, Lentine consulted with Gendron on potential chargeback issues with Comcast and distribution of bonuses. In an email with a Comcast agent dated December 11, 2014, Gendron and Lentine discussed the possibility of a pay increase for LeCom Communications's services. And in another set of emails, Lentine explained to that same Comcast agent that LeCom Communications did everything it promised it would do to meet Comcast's "manpower forecast" for that month, citing attrition as a reason for their disappointing performance. Those emails indicate that Lentine regularly communicated with Comcast about LeCom Communications's business.

The case law Lentine cites counsels against granting summary judgment in his favor. In *Fegley v. Higgins*, 19 F.3d 1126 (6th Cir. 1994), the Sixth Circuit, applying the *Dole* test, found that the CEO of the defendant corporation was personally liable under the FLSA. The court cited the corporate officer's significant ownership interest, control of significant functions of the business, and salary setting and hiring authority among the relevant considerations. *Id.* at 1131. The court also noted that the defendant was responsible for obtaining contracts for the corporation's prototype parts business. *Ibid.* Although Lentine has offered some evidence that he played no part in LeCom Communications's operations, at a minimum, he has conceded that he was responsible for procuring LeCom Communications's contracts with Comcast, undercutting his defense that Gendron exclusively steered the ship.

In *United States of Labor v. Cole Enterprises, Inc.*, 62 F.3d 775, 778 (6th Cir. 1995), the Sixth Circuit reaffirmed the considerations announced in *Dole* and *Fegley*, explaining that "[o]ne who is the chief executive officer of a corporation, has a significant ownership interest in it,

controls significant functions of the business, and determines salaries and makes hiring decisions has operational control and qualifies as an 'employer' for the purposes of FLSA." (citing *Fegley*, 19 F.3d at 1131). Of relevance here, the court noted that the defendant "was engaged in running the business, . . . authorized to issue checks on the corporate accounts, . . . had custody and control of the employment records, . . . and was involved in scheduling of hours, payroll, and the hiring of employees." *Ibid.* When considering the facts put forth by both sides in this case, it is difficult to conclude that *Cole* conclusively supports either party.

*Gray v. Powers*, 673 F.3d 352 (5th Cir. 2012), is distinguishable because the plaintiff failed to offer any evidence of the individual defendant's hiring and firing authority at the nightclub where the plaintiff worked as a bartender. Acknowledging that "employer status may be appropriate where operational control coincides with one's position as a shareholder, officer, or owner," it explained that "a status-based inference of control cannot alone suffice to create a genuine fact issue whether Powers had power to hire or fire." 673 F.3d at356. The court also concluded that plaintiff failed to offer any evidence to support the other factors.

The plaintiffs' recitation of case law is underdeveloped and similarly does not conclusively support summary judgment in their favor. *See Saavedra v. Lower's Home Ctrs.*, 748 F. Supp. 2d 1273, 1288 (D.N.M. 2010) (applying FLSA-derived multifactor test in FMLA case where plaintiff's manager exercised direct supervisory control over plaintiff); *Velasquez v. US 1 Farm Market Inc.*, No. 13-00634, 2016 WL 2588160 (D. Conn. May 3, 2016) (individual defendant's "*undisputed* responsibilities, such as being involved in hiring decisions and determining employee compensation, reflect[ed] operational control over significant aspects of Farm Market") (emphasis added); *Jensen v. Redcliff Ascent, Inc.*, No. 13-00275, 2014 WL 2739297 (D. Ut. June 17, 2014)

(collecting cases and allowing plaintiffs to amend complaint to include allegations against individual defendants); *Solis v. Universal Project Mgmt.*, No. H-08-1517, 2009 WL 4043362 (S.D. Tex. Nov. 19, 2009) (question of fact if individual defendants were employers under the FLSA); *Doe v. Cin-Lan, Inc.*, No. 08-12719, 2009 WL 2568516 (E.D. Mich. Aug. 18, 2009) (Murphy, J.) (declining to grant summary judgment in favor of individual defendant on issue of employer status where record was incomplete due to discovery dispute).

In *Alvarez Perez v. Sanford-Orlando Kennel Club, Incorporated*, 515 F.3d 1150, 1160 (11th Cir. 2008), the Eleventh Circuit emphasized that "in order to qualify as an employer [under the FLSA], an officer 'must either be involved in the day-to-day operation or have some direct responsibility for the supervision of the employee.'" (quoting *Patel v. Wargo*, 803 F.2d 632, 637-38 (11th Cir. 1986)).  The court concluded that the majority shareholder of the entity-employer, after suffering a heart attack in 1998, did not take part in the supervision or hiring or firing of employees or determine their compensation.  *Id.* at 1161.  The court did not give weight to the idea that the defendant could have played a greater role in the day-to-day operations if he had desired, noting that "unexercised authority is insufficient to establish liability as an employer."  *Id.* at 1161 (citations omitted).  The plaintiffs in this case similarly cannot point to Lentine's potential, but unused, power to weigh in on hiring and firing decisions as well as compensation to establish operational control.

There is no requirement that Lentine "have exclusive control of [LeCom Communications's] day-to-day functions" to qualify as an employer under the FLSA.  *Dole*, 942 F.2d at 966.  However, because the degree of his involvement remains in dispute, both Lentine's and the plaintiffs' motions for summary judgment must be denied.

-46-

D.  Statute of Limitations

Defendants LeCom Communications and Lentine argue that there is no evidence of willfulness in the record that would support an extension of the statute of limitations in this case. They argue that LeCom Communications required the subcontractors to comply with the FLSA and that they were unaware of any overtime violations.  The plaintiffs respond that prior FLSA overtime violations at LeCom Communications serve as actual notice to the defendants and that they cannot now claim that they were unaware of the requirements of the statute.  The plaintiffs argue that the defendants' actual notice supports a finding of reckless disregard for the statute's requirements.

Suits for unpaid overtime compensation "may be commenced within two years after the cause of action accrued . . . except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued." 29 U.S.C. § 255(a).  "A violation is 'willful' if 'the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the [FLSA].'" *Stultz v. J.B. Hunt Transport, Inc.*, 35 F. Supp. 3d 866, 878 (E.D. Mich. 2014) (Duggan, J.) (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 129 (1988)).  "The plaintiff bears the burden of proving willfulness."  *Id.* at 878 (citation omitted).

The plaintiffs argue that the undisputed facts in this case closely mirror those in *Dole*, where the Sixth Circuit found that the defendants' violation of the FLSA was willful.  In *Dole*, the Secretary of Labor provided undisputed evidence that the defendants previously were investigated by the Department of Labor (DOL) for overtime violations and that the prior violation was "resolved upon payment of overtime wages and an assurance of future compliance with the FLSA."  *Dole*, 942 F.2d at 967.  The individual defendant in that case offered excuses similar to

-47-

those presented by LeCom Communications and Lentine, all of which the court of appeals found unpersuasive.  The court concluded that as the "top man" at the corporation, the individual defendant "had actual notice of the requirements of the FLSA by virtue of earlier violations, his agreement to pay unpaid overtime wages, and his assurance of future compliance with the FLSA." *Ibid.*

Here, Gendron testified that in 2004 or 2005, the DOL investigated LeCom Communications for failure to pay its W-2 employee-technicians overtime.  The DOL found that LeCom Communications had failed to pay overtime rates on piece rate amounts earned by employees.  LeCom Communications thereafter changed its policy for its employees to comply with the FLSA.  He testified that once LeCom Communications began using independent contractors in 2013, it did not extend its overtime policy to these technicians.  Gendron stated that the subcontracting agencies were responsible for making any necessary overtime payments.

In light of *Dole* and Gendron's testimony, a jury reasonably could conclude that the defendants had actual notice of their obligations under the FLSA and therefore willfully violated its provisions.  The defendants' argument that these circumstances are different because the present plaintiffs are not their employees, but independent contractors, falls flat as the alleged misclassification of the plaintiffs is the very heart of this case.  Summary judgment on this issue will be denied.

III.

The undisputed facts establish that the plaintiffs are entitled to a judgment of liability against LeCom Communications as a matter of law.  Likewise, defendant LeCom, Inc. is entitled

-48-

to a judgment of dismissal as a matter of law.  Fact questions preclude summary judgment for or against defendants Joseph Lentine and Jeffrey Gendron.

Accordingly, it is **ORDERED** that the plaintiffs' motion for partial summary judgment against LeCom Communications and LeCom, Inc. (R. 81) is **GRANTED IN PART AND DENIED IN PART**.  Judgment of liability against LeCom Communications is **GRANTED**.  The motion is **DENIED** in all other respects.

It is further **ORDERED** that the motion for summary judgment by defendant LeCom, Inc. (R. 137) is **GRANTED.**

It is further **ORDERED** that the plaintiffs' motion for partial summary judgment against defendants Joseph Lentine and Jeffrey Gendron (R. 142) is **DENIED**.

It is further **ORDERED** that the motions for summary judgment by defendants Jeffrey Gendron and Joseph Lentine (R. 135, 138) are **DENIED**.

It is further **ORDERED** that the motion for partial summary judgment by defendant LeCom Communications (R. 136) is **DENIED**.

It is further **ORDERED** that the amended complaint is **DISMISSED WITH PREJUDICE** as to defendant LeCom, Inc., **only**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Date:   September 30, 2018

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first-class U.S. mail on September 30, 2018.

s/Susan K. Pinkowski
SUSAN K. PINKOWSKI